Clawvern JACOBS, Appellant,

v.

COMMONWEALTH OF KENTUCKY, Appellee.

No. 1997–SC–0248–MR.

Supreme Court of Kentucky.

Oct. 25, 2001.

Donna L. Boyce, Appellate Branch Manager, Department of Public Advocacy, Frankfort, Kelly A. Gleason, Assistant Public Advocate, Stanton, Counsel for Appellant.

A.B. Chandler, III, Attorney General, David A. Smith, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

KELLER, Justice.

## I. INTRODUCTION

In *Jacobs v. Commonwealth* ("*Jacobs I*")[1] this Court reversed Jacobs's death sentence and convictions for capital murder, kidnapping, and attempted first degree rape and remanded the case for a new trial. Upon remand, a Warren Circuit Court jury found Jacobs guilty of capital murder, first degree sexual abuse, and first degree kidnapping and recommended a sentence of death for the capital murder conviction. Jacobs and the Commonwealth agreed to waive their rights to jury sentencing for the other convictions. At final sentencing, the trial court imposed the death sentence recommended by the jury for Jacobs's capital murder conviction and concurrent sentences of five (5) years for first degree sexual abuse and life imprisonment for the first degree kidnapping conviction. Jacobs thus appeals to this Court as a matter of right.

After a review of the record and the arguments raised in the briefs and at oral argument, we affirm each of Jacobs's convictions, but reverse Jacobs's sentence of death and remand Jacobs's capital murder conviction to the trial court for a new sentencing hearing because we find no proper aggravating circumstance which authorizes the death penalty. Our holding renders moot many of Jacobs's arguments which allege errors committed during individual voir dire and the capital sentencing phase as well as those which generically indict Kentucky's capital sentencing procedures. We will address each of the alleged guilt/innocence phase errors and the capital sentencing phase error which we find dispositive.

## II. ALLEGED GUILT/INNOCENCE PHASE ERRORS

### A. DOUBLE JEOPARDY ISSUES

Jacobs argues that, because of an alleged omission in the kidnapping instruc-

---

1. Ky., 870 S.W.2d 412 (1994).

tion at his first trial, the jury "actually" returned a verdict for Class B kidnapping which should have barred his retrial on the greater offense of capital kidnapping. On direct appeal from his original conviction, Jacobs argued that this Court should reverse his capital kidnapping conviction because of this same alleged error in the instruction. This Court did not separately address this allegation of error, but the majority opinion clearly expresses its view of its merits:

> Jacobs, through counsel, raises 42 assignments of alleged error in this appeal. We have reviewed all issues presented by Jacobs.... *Allegations of error which we have considered to be without merit will not be herein addressed.*[2]

This Court found no merit to this allegation of error the first time Jacobs raised it, and we find it no more persuasive now that Appellant has recast it as a double jeopardy argument. The jury in Jacobs's original trial returned a verdict for capital kidnapping, and the Commonwealth properly sought retrial of that offense after *Jacobs I.*

In two separate, indistinguishable arguments, Jacobs asserts that double jeopardy principles prohibit convictions for both murder and capital kidnapping because murder is a lesser included offense of capital kidnapping. We rejected this argument in *St. Clair v. Roark*,[3] and our views remain unchanged.

## B. ISSUES CONCERNING JACOBS'S COMPETENCY TO STAND TRIAL

Jacobs raises a number of issues relating to the trial court's finding that he was competent to stand trial. Jacobs specifically alleges that the trial court erred by: (1) sustaining the Commonwealth's objection to defense expert Dr. Alec Whyte's opinion regarding Jacobs's competence to stand trial; (2) denying Jacobs's motion for funds and thereby preventing Jacobs from having a defense expert participate during Jacobs's competency evaluations at KCPC; (3) improperly assigning the burden of proof as to competency to stand trial; (4) finding Jacobs competent to stand trial and to waive a defense of insanity; (5) failing to reconsider the question of Jacobs's competency during the course of the trial; and (6) denying Jacobs's motion to supplement the official transcript record with videotapes. We find that the trial court's rulings were within its discretion and find no error warranting reversal.

■ Dr. Alec Whyte testified for the defense at Jacobs's pretrial competency hearing. Although the trial court allowed Dr. Whyte to testify generally about the manifestations of delusional disorder and to answer hypothetical questions about how this disorder could affect a criminal defendant during the course of a jury trial, the trial court sustained the Commonwealth's objection to Dr. Whyte's opinion as to Jacobs's competence to stand trial. Dr. Whyte testified that, in preparation for his testimony, he reviewed reports and other materials, many of which dated back almost eight (8) years, from other medical personnel who had evaluated Jacobs for competency, but that he was unable to perform his own psychiatric evaluation because he met with Jacobs for only fifteen (15) minutes before Jacobs refused to an-

---

**2.** *Id.* at 415 (emphasis added).

**3.** Ky., 10 S.W.3d 482, 486–7 (1999) ("The flaw in this reasoning [is] the conclusion that the *murder* of the victim is the element which enhances the offense of kidnapping from a class A felony to a capital offense. Not so. It is the *death* of the victim which enhances kidnapping to a capital offense." *Id.*).

swer any further questions. Dr. Whyte explained that he "could not make any determination at all about the problems of ... organically caused symptoms" during that short time frame, but was prepared to offer his opinion on the basis of the materials he had reviewed. The trial court allowed Dr. Whyte to express his opinion by avowal, and Dr. Whyte explained that, although he had no evidence to support a finding of incompetence at the present time, he predicted that Jacobs would "decompensate" during the course of the trial.

We believe the trial court's ruling struck a proper balance with respect to Dr. Whyte's opinion testimony and find no identifiable prejudice from the ruling. Not only did Dr. Whyte testify to his opinion before the trial judge by means of avowal, but he also communicated his opinion via answers to hypothetical questions, and those opinions did not differ substantially from those of the other defense witnesses. In fact, just prior to the competency hearing, during a bench conference regarding reciprocal discovery of Dr. Whyte's opinions, defense counsel "downplayed" the significance of Dr. Whyte's testimony and characterized it as cumulative to other testimony:

> The only thing that Dr. Whyte has done is look at records, and that's the same records that the A.G.'s office has or that they gave to us. *There are no diagnoses he is going to give that will differ substantially from Dr. Deland, if any.* There is nothing he is going to say that is going to come as a surprise to [the prosecution]. *There are no facts, there are no new evidence he's picked up.*

. . .

Now, there has been no intention, there's been no purpose to mislead anybody. The Court will hear Dr. Whyte testify. There is nothing of any surprise in nature going to come out today. . . . We simply do not have a report other than—The only thing I could have told [the prosecution] in a memorandum would have been: Client would not talk to doctor. Or: Client would not talk to doctor, but agreed with Dr. Deland's Organic Delusional Syndrome diagnosis. That's it. I mean, there's nothing here.

Given the substantial agreement between Dr. Whyte's and Dr. Deland's findings, as well as the fact that trial court's competency ruling directly referenced Dr. Whyte's avowal testimony, we do not believe the exclusion of Dr. Whyte's opinion affected the pretrial competency determination or otherwise prejudiced Jacobs.

■ We likewise see no prejudice associated with the trial court's denial of defense motions for funds to obtain a mental health expert. Initially, we note that the trial court did approve funds for the defense to obtain such an expert, and Dr. Whyte testified for the defense at the competency hearing as a retained expert. Jacobs's alleged error relates to the timing of the trial court's approval of funds. Although Jacobs asserts that the trial court's rulings initially denying those funds and ordering his evaluation at KCPC violated his statutory right to have a defense expert participate in the examination,[4] the defense does not cite the Court to any assertion of entitlement under KRS 504.080(5) until *after* the KCPC evaluation. Further, the KCPC evaluator, Dr. Deland, although apparently subpoenaed by the Commonwealth, was called by the *defense* as an expert witness at the pretrial compe-

---

4. *See* KRS 504.080(5) ("A psychologist or psychiatrist retained by the defendant shall be permitted to participate in any examination under this chapter." *Id.*); *McCracken Co. Fiscal Court v. Graves,* Ky., 885 S.W.2d 307, 313 (1994).

tency hearing to testify to the diagnosis of a delusional syndrome and to the fact that a defendant's mental status, and therefore competency status, can change over time. Jacobs asserts that he suffered prejudice from the trial court's ruling because the trial court found significant Dr. Deland's opinion that Jacobs was competent to stand trial, but Jacobs articulates no argument for how a contrary ruling on the motion for funds would have provided a basis for him to question that testimony. In fact, Dr. Whyte, whom the defense eventually retained, agreed with Dr. Deland's findings. While no defense-retained mental health expert was present for the two-month period of observation, evaluation, and treatment at KCPC, defense *counsel* were present for a portion of that time, yet the defense examination of Dr. Deland raised no questions regarding Deland's procedures.

■ After hearing argument from the parties, the trial court ruled that the burden was upon the defense to prove Jacobs's incompetence by a preponderance of the evidence. Jacobs argues that this ruling was in error for a number of policy and constitutional reasons and submits that this is a question of first impression for this Court. In fact, however, we answered this question in *Gabbard v. Commonwealth*,[5] and none of Jacobs's arguments persuade us that our conclusion was wrong. No provision of the United States Constitution prohibits this Court from requiring the defendant to carry the burden of proving his incompetence,[6] and we find no merit in Jacobs's contention that the Kentucky Constitution requires the Com-

monwealth to prove the defendant's competence beyond a reasonable doubt.

■ In addition to reviewing the testimony and reports relating to Jacobs's competency at his original trial, the trial court conducted a two-phase pretrial evidentiary hearing on the question of Jacobs's competency. The first phase was an ex parte proceeding in which Jacobs's trial counsel introduced affidavits from Jacobs's past and present attorneys concerning their attorney-client communications with Jacobs. During the second phase, with the Commonwealth present, Jacobs introduced testimony from a handful of law enforcement and corrections personnel who had interacted with Jacobs as well as the expert testimony of both Dr. Deland and Dr. Whyte. The Commonwealth relied upon its cross-examination of the witnesses called by the defense and did not offer any additional witnesses. At conclusion of the hearing, the trial court found Jacobs presently competent to stand trial and to direct his defense:

> Well, we're all aware that [RCr 8.06] provides that in making these determinations, I'm to look at whether or not Mr. Jacobs has the capacity to appreciate the nature and consequences of the proceedings against him. I don't think there is much dispute about the fact that he has at least a general, if not specific knowledge, of the nature and consequences of all the proceedings. I don't think that issue has been raised by either side. The question comes down basically to whether or not Mr. Jacobs can rationally participate in his defense. The Court is well aware of all previous evaluations conducted upon Mr. Jacobs.

**5.** Ky., 887 S.W.2d 547, 551 (1994) (holding that although "the presumption that a defendant is competent to stand trial disappears when there are reasonable grounds to hold a competency hearing .... [the defendant] continues to bear the ultimate burden at a com-

petency hearing of proving that he is incompetent to stand trial." *Id.*).

**6.** *See Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992).

They're all part of the record. I'm well aware of all the testimony that's been taken concerning his competency at the first trial of this matter. Quite frankly, there's no doubt in this mind, or this Court's mind, that at the time of the first trial, Mr. Jacobs was probably incompetent to stand trial based upon all the reports that I've reviewed. However, that's not the issue today. The issue is whether or not he's competent to stand trial today.... I take note of the fact Dr. Deland's testimony that although his report is worded that he does agree with the diagnosis of this delusional disorder, he went into some detail to explain what he meant when he said in remission.... [H]e said it does exist but he's able to control those delusions. As to Dr. Whyte, Dr. Whyte testified that he did agree with the diagnosis previously made even going back to I guess the old phraseology of Organic Delusional Syndrome. That he felt that Mr. Jacobs suffered from that condition. I asked the doctor, Dr. Whyte, if it was his opinion that once someone develops that condition whether or not they could ever be competent to stand trial. His response was it depended upon whether or not his delusions were, I believe he used the word broached during the trial, and if they were not broached during the trial that would not make him incompetent to stand trial. During the avowal that we had, which I will refer to, he did testify that if those ... delusions were broached during a trial, that in his opinion that Mr. Jacobs would become incompetent. That's speculative. I don't know what's going to happen at this trial. It may very well develop that way, but that's something—that's a matter that we'll need to approach at the

trial of this action as it is the finding of this Court that Mr. Jacobs is competent to stand trial, is competent to direct his attorney as to his defense.

Jacobs argues that the trial court had no rational basis for this finding. As was the case in *Harston v. Commonwealth*,[7] Jacobs's conclusions flow from a partisan view of the evidence:

[Appellant] makes extensive arguments with regard to the competency issue and the insanity issue. All the arguments assume incompetency and insanity. It would appear elementary to us that where the ruling is based on substantial evidence, there is no error. There is an abundance of evidence in the record to support the ruling that [Appellant] was competent to stand trial.... [8]

In this case, the trial court's ruling was unquestionably based on substantial evidence. In fact, *none* of the testimony from the lay witnesses called during the second phase of the evidentiary hearing supported a finding of incompetence, and *neither* of the experts testified that Jacobs was presently incompetent to stand trial. Dr. Deland testified that Jacobs's mental status had improved and that after two (2) months of observation, he came to the conclusion that Jacobs's "diagnosis hasn't changed, but his insight has." On the basis of Jacobs's "ability to distinguish what his remaining symptoms are and what is realistic in terms of the presentation," Dr. Deland testified that it was his opinion that Jacobs was competent to stand trial. Although the Appellant bemoans the lack of evidence supporting the finding that he was competent to direct his defense, Dr. Deland testified to his opinion

**7.** Ky., 638 S.W.2d 700 (1982).

**8.** *Id.* at 702. *See also Mozee v. Commonwealth,* Ky., 769 S.W.2d 757, 758–9 (1989) (evaluating "the totality of the evidence").

that Jacobs was competent to do so and explained the basis for that opinion:

> He had a logical reason for pursuing this defense as we talked about before, the issue with the jury and what he would have to say to mount a mental illness defense. Secondly, he's not presenting anything, any explanations that are not of this world. They're not blatantly delusional or blatantly unrealistic. Thirdly, he—the issue has come up time and time again about whether he can cooperate with his lawyers. I can only say to that that he cooperated with me throughout the two (2) months that he was there. And he said, his words, that if they drop—if his lawyers would drop this mentally ill angle on his case, that he said I would have to cooperate with them. Plus, he has a—he has a realistic assessment I would say of—he knows what he's facing. He knows there's a strong case against him.

While Dr. Whyte did express the opinion that Jacobs would inevitably become incompetent during the course of the trial, he offered no opinion as to the issue before the Court—whether Jacobs was presently competent to stand trial.

On appeal, Jacobs argues that Dr. Deland's opinion was predicated on the information available to him at the time of his evaluation and that the information disclosed to the trial court by Jacobs's attorneys rendered that opinion unreliable. Both in the trial court and again on appeal, Jacobs's counsel attempt to "spin" Dr. Deland's answers to hypothetical questions posed to him by the defense as qualifications upon his opinion. Dr. Deland actually testified that if Jacobs had recently demonstrated the delusional thinking and behavior suggested by hypothetical questions from the defense, he would have to assess the basis for Jacobs's statements in order to determine whether Jacobs's delu-

sional disorder would interfere with his ability to rationally participate in his defense. Dr. Deland testified that his findings also considered his observations of Jacobs's interaction with his attorneys at KCPC:

> I thought it would be a good idea if his attorneys came in and talked to him directly so I could observe that, and they did. We spent over an hour in my office with Mr. Clawvern Jacobs discussing issues, and I must say that things got pretty tense; but, through it all, Mr. Jacobs maintained his demeanor.

The trial court properly weighed the credibility of the witnesses and reached conclusions which were supported by substantial evidence. Thus, we find no error.

After the trial court's ruling at the conclusion of the pretrial evidentiary hearing, but before the conclusion of the guilt/innocence phase of Jacobs's trial, Jacobs's counsel asked the trial court four (4) separate times to revisit the competency issue. A similar motion was made prior to final sentencing. Each of the motions alleged that Jacobs had exhibited further delusional behavior of the type described in the affidavits by counsel submitted ex parte to the trial court before the evidentiary hearing. Two of these motions concerned Jacobs's guilt/innocence phase trial testimony, which obviously was conducted in the trial court's presence. The trial court found no reasonable cause to revisit the issue, and denied each of the motions. In *Harston,* we held that trial courts have the discretion to determine whether reasonable cause exists to revisit competency issues:

> [RCr 8.06] has the salutatory provision that if at any stage of the proceeding the trial court has a doubt as to competency, there is an obligation to make an inquiry. This rule does not place upon the trial court a duty to hold

hearing after hearing in the absence of some appearance of change in the defendant's condition since the ruling on competency. Ordinarily the application of RCr 8.06 would involve some behavior on the part of the defendant which would indicate incompetency to the trial court. Necessarily the trial court has discretion in this respect, and there is no right to a continual succession of competency hearings in the absence of some new factor. There was no abuse of discretion here on the part of the trial court in denying further testimony on the issue already ruled upon.[9]

As in *Pate v. Commonwealth*,[10] "[t]he trial judge had an ample opportunity to observe the defendant during the competency hearing and during the trial."[11] We find that the trial court acted within its discretion in denying the motions to revisit Jacobs's competency.

▎ Finally, Jacobs argues that the trial court's failure to supplement the "official" record with the videotapes of the proceedings denied him his right to a full and fair appeal by preventing this Court from fully assessing and determining the issues surrounding Jacobs's competency. We find this allegation of error completely without merit because the record before us allows us to properly evaluate each of Jacobs's allegations of error, and Jacobs has not articulated any coherent argument as to how he was prejudiced by the trial court's ruling. In any event, the record indicates that Jacobs agreed by stipulation that the stenographic record in this case would be the official record on appeal.

## C. JURY SELECTION ISSUES

Jacobs alleges that the trial court committed reversible error during jury selection by: (1) automatically excusing senior citizens from the panel; (2) failing to excuse for cause certain jurors, (3) failing to give an adequate number of peremptory challenges, (4) failing to sequester the jury; and (5) denying a defense motion to solicit information from the jury panel through a pretrial jury questionnaire.

Although Jacobs argues that the trial court had a policy of automatically excluding any senior citizen from the panel, the record specifically refutes this claim. The trial court stated, "My rule is that, although *I don't automatically exclude them*, if they're over sixty-five (65), and they don't wish to serve ... I'm not going to make them serve." The record also reflects that: (1) several senior citizens did not ask to be excused and remained on the panel; and (2) the senior citizens who were excused gave valid reasons other than their age for their requests. The trial court acted within its discretion to determine whether members of the panel have valid reasons to be excused from service, and there was no evidence of systematic exclusion of a particular group which implicated Jacobs's constitutional rights.[12]

Jacobs argues that the trial court erred by failing to strike for cause seven (7) members of the jury panel. Jacobs challenged three (3) of these jurors (Jurors #72, 58, and 77) solely on the basis of their inability to consider mitigation evidence or the full range of penalties available in a capital case, and we believe the disposition in this case renders these allegations of error moot. Jacobs alleges that

---

**9.** *Harston v. Commonwealth, supra* note 7 at 701. *See also Mozee v. Commonwealth, supra* note 8 at 759.

**10.** Ky., 769 S.W.2d 46 (1989).

**11.** *Id.* at 47.

**12.** *See Commonwealth v. McFerron*, Ky., 680 S.W.2d 924 (1984).

four (4) other jurors (Jurors # 66, 4, 61, and 41) could not apply the presumption of innocence, would be affected by the passage of time between indictment and trial, or were otherwise unable to fairly determine Jacobs's guilt or innocence. We have carefully reviewed the record of the voir dire examination in this case, and find that, although the jurors initially exhibited some customary and natural confusion and curiosity, each stated that he or she could follow the trial court's instructions regarding the burden of proof and the presumption of innocence and that the passage of time would not effect his or her decision. Accordingly, the trial court did not abuse its discretion when finding each juror qualified to serve.[13]

■ Although the trial court granted Jacobs eleven (11) peremptory challenges—two (2) more than required by RCr 9.40—Jacobs argues that the trial court abused its discretion by denying his request for fifteen (15) peremptory challenges. As in *Brewster v. Commonwealth*,[14] "we believe the actions of the trial court were altogether proper and certainly do not constitute an abuse of discretion."[15]

■ Jacobs asserts that this Court should adopt a bright-line rule requiring that the jury be sequestered in all capital cases after closing arguments in the guilt/innocence phase and until they render a penalty phase verdict. Both the Rules of Criminal Procedure[16] and our prior decisions[17] leave such decisions to the discretion of the trial court. We find no support for Jacobs's contention that the United States and Kentucky Constitutions require sequestration in capital cases. The trial court did not abuse its discretion in denying Jacobs's motion to sequester the jury.

■ Jacobs argued that the trial court erred when it denied his motion to submit an eight (8) page, fifty-two (52) question questionnaire drafted by defense counsel to members of the jury panel. We find the trial court's ruling in accordance with this Court's admonition in *Sanborn v. Commonwealth*[18] and well within his discretion to control the scope of voir dire examination.[19]

## D. EVIDENTIARY ISSUES

During its case-in-chief, the Commonwealth introduced five (5) photos of the victim's body which Det. Frank Fleming and Medical Examiner John Hunsaker uti-

---

**13.** *See Bowling v. Commonwealth*, Ky., 873 S.W.2d 175, 177 (1993) ("A trial court has discretion when deciding whether to excuse a juror for cause." *Id.*); *Thompson v. Commonwealth*, Ky., 862 S.W.2d 871, 874 (1993).

**14.** Ky., 568 S.W.2d 232 (1978).

**15.** *Id.* at 236.

**16.** *See* RCr 9.66 ("Whether the jurors *in any case* shall be sequestered shall be within the discretion of the court ...." *Id.* (Emphasis added)).

**17.** *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872, 888 (1992) ("The decision to sequester the jury resides within the discretion of the

trial court from the onset of the proceedings." *Id.*).

**18.** Ky., 754 S.W.2d 534, 546 (1988) (criticizing trial court's voir dire procedure which "allowed prospective jurors to study and formulate their responses outside the presence of appellant and his counsel").

**19.** *See Webb v. Commonwealth*, Ky., 314 S.W.2d 543, 545 (1958) ("The scope of inquiry is best governed by a wise and liberal discretion of the court. The exercise of the discretion does not constitute reversible error unless clearly abused and when it appears that harmful prejudice has been caused thereby." *Id.*); *McIntosh v. Commonwealth*, Ky. App., 582 S.W.2d 54, 60 (1979).

lized to describe the condition and nature of the body and the injuries inflicted. Jacobs argues the introduction of these pictures was unduly prejudicial. While this Court has found the introduction of photographs improper where the photographs depict "mutilation, decomposition and decay not directly related to the crime," [20] these relatively non-graphic photographs had considerable relevance to the Commonwealth's case. We find that the trial court properly found that the probative nature of the photographs was not "substantially outweighed by the danger of undue prejudice." [21]

## E. ISSUES REGARDING GUILT/INNOCENCE PHASE JURY INSTRUCTIONS

Jacobs alleges that the trial court's jury instructions were prejudicially erroneous in eight (8) respects by: (1) allowing the jury to find Jacobs guilty of capital kidnapping instead of Class B kidnapping; (2) failing to instruct on the "mistake of fact" defense; (3) failing to include an instruction on first degree unlawful imprisonment as a lesser-included offense to kidnapping; (4) failing to include an instruction on first degree manslaughter as a lesser-included offense to murder and by failing to incorporate an extreme emotional disturbance element in the murder instruction; (5) failing to define reasonable doubt and clarify the Commonwealth's burden of proof; (6) inadequately defining the presumption of innocence; (7) failing to include an instruction prohibiting the jurors from discussing punishment during their guilt/innocence phase deliberations; and (8) failing to instruct the jurors that the time lapse between indictment and trial was the Commonwealth's fault. We find that the trial court properly instructed the jury.

Jacobs's first allegation of error in the trial court simply repeats the double jeopardy argument concerning the kidnapping verdict at his first trial which we addressed above in Part II(A).

■ Jacobs's second allegation of error concerns Jacobs's testimony regarding his belief that the victim in this case was a prostitute. Jacobs testified that a friend had described and directed him to an Alice Lloyd College student and prostitute named Tanya. Jacobs explained that, on the date of these alleged crimes, he drove to the location described by his friend and waited until a woman approached who fit "Tanya's" description. Jacobs testified that he asked the woman if she was "Tanya," that the woman replied yes, and that she agreed to come with him in his vehicle. On the basis of this testimony, Jacobs's trial counsel tendered a requested attempted first degree rape instruction which included an element outlining the KRS 501.070, mistake-of-fact defense: "C. That in so doing, Clawvern Jacobs was not acting out of a mistaken belief that Judy Ann Howard was willing to have sexual intercourse with him." The defense orally requested that similar language be added as an element of the kidnapping instruction. Jacobs argues the trial court erred by failing to instruct the jury regarding this defense.

KRS 501.070(1) explains the limited circumstances in which a mistake of fact constitutes a defense to a crime:

---

**20.** *Funk v. Commonwealth*, Ky., 842 S.W.2d 476, 478–9 (1992). *See also Clark v. Commonwealth*, Ky., 833 S.W.2d 793, 794 (1991).

**21.** KRE 403. *See also Foley v. Commonwealth*, Ky., 953 S.W.2d 924, 935 (1997); *Whitaker v. Commonwealth*, Ky., 895 S.W.2d 953, 954 (1995); *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835, 843 (1990); *Gall v. Commonwealth*, Ky., 607 S.W.2d 97, 106–7 (1980), cert. denied 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 824 (1981).

A person's ignorance or mistake as to a matter of fact or law does not relieve him of criminal liability unless:

 (a) Such ignorance or mistake negatives the existence of the culpable mental state required for commission of an offense; or

 (b) The statute under which he is charged or a statute related thereto expressly provides that such ignorance, or mistake constitutes a defense or exemption; or

 (c) Such ignorance or mistake is of a kind that supports a defense of justification as defined in this Penal Code.[22]

In *Cheser v. Commonwealth*,[23] the Court of Appeals reviewed authority from other jurisdictions and explained that KRS 501.070 requires an instruction outlining the mistake-of-fact defense if: (1) the evidence at trial would allow a jury to infer that the defendant's actions resulted from a reasonable and bona fide mistake of fact;[24] and (2) one of the circumstances described in KRS 501 .070(1)(a)-(c) are present—typically, in cases where the mistake "negates the existence of the mental state ... which is statutorily prescribed for the commission of an offense."[25] *Cheser* discussed the requisite evidentiary foundation for such an instruction:

A defense is so raised by the presentation of evidence from which a jury could reasonably infer that the intent element of the crime is excused, and that could justify a reasonable doubt of the defendant's guilt as the defendant

did not know what he or she was doing. The sufficiency of the evidence in such situations is a question of law for the courts to determine on a case-by-case basis.[26]

We believe the trial court properly denied Jacobs's request for an instruction as to the KRS 501.070, mistake-of-fact defense. Although Jacobs argues that his mistaken belief would constitute a defense to the kidnapping and first degree sexual abuse charges because the instructions required the jury to find that "in so restraining Judy Ann Howard it was the Defendant's intention to accomplish or advance the commission of Attempted Rape in the First Degree, to inflict bodily injury or to terrorize Judy Ann Howard," the totality of the evidence presented, as well as trial counsel's characterization of this testimony as "delusional," lead us to find that the trial court did not err in failing to instruct on such a patently unreasonable "mistake."

We likewise find no error in the trial court's failure to instruct on first degree unlawful imprisonment and first degree manslaughter as lesser-included offenses to kidnapping and murder. Lesser-included offenses are "appropriate only when the state of the evidence is such that a juror might entertain reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond reasonable doubt that the defendant is guilty of the lesser offense."[27] We see no evidence which would allow such inferences, and, in the absence of any evidence raising the

---

**22.** KRS 501.070(1).

**23.** Ky.App., 904 S.W.2d 239, 241–3 (1994).

**24.** *Id.* at 242.

**25.** *Id.*

**26.** *Id.*

**27.** *Billings v. Commonwealth*, Ky., 843 S.W.2d 890, 894 (1992). *See also Parker v. Commonwealth*, Ky., 952 S.W.2d 209, 211–212 (1997) ("Lesser-included offense instructions are proper if the jury could consider a doubt as to the greater offense and also find guilt beyond a reasonable doubt on the lesser offense." *Id.*).

issue of extreme emotional disturbance, the trial court properly omitted it as an element in the murder instruction.[28]

Jacobs's last four allegations of error concerning the trial court's instructions are completely without merit. Although Jacobs maintains that jury instructions must define reasonable doubt and the prosecution's burden of proof, this Court has consistently held otherwise,[29] and the United States Supreme Court agrees.[30] This Court recently approved an instruction identical to the trial court's presumption of innocence instruction.[31] Finally, we find no constitutional principle which requires trial courts to give prophylactic instructions prohibiting punishment discussion or incorrectly explaining the reason for the time lapse between indictment and trial.

## F. JACOBS'S RIGHT TO CONTROL HIS DEFENSE

In *Jacobs I*, we addressed Jacobs's argument that he had a right to present a defense on the merits which his counsel denied by presenting an insanity defense over his objection and directed that, upon retrial, "it is the trial court who shall determine if the defendant is the master of his own defense and pilot of the ship"[32] by holding a hearing "as to Jacobs' ability to voluntarily and intelligently understand and waive such [insanity] defense ... and upon the finding of the trial court as to Jacobs' ability to waive such defense, defense counsel shall be bound."[33] As explained in Part II(B) above, the trial court found Jacobs competent to both stand trial and to direct his defense. The trial court ruled that Jacobs's counsel were bound by the defendant's decision "not to...present any evidence of any mental illness," including by avowal, during either the guilt/innocence or penalty phases of the trial.

Jacobs's counsel filed an original action in this Court seeking a writ which would order the trial court "to fashion an appropriate method or procedure which will permit petitioner's counsel to submit offers of proof and/or avowals on the issue of Mr. Jacobs' mental illness and its impact upon his conduct, behavior, his decision-making, and other matters of consequence in the upcoming proceedings" and/or to "order

**28.** *See Wellman v. Commonwealth*, Ky., 694 S.W.2d 696, 697 (1985). *See also Gall v. Commonwealth, supra* note 21 at 108 ("An instruction on murder need not require the jury to find that the defendant was not acting under the influence of extreme emotional disturbance unless there is something in the evidence to suggest that he was, thereby affording room for a reasonable doubt in that respect." *Id.*).

**29.** *See* RCr 9.56(2) ("The instructions should not attempt to define the term 'reasonable doubt.'" *Id.*); *Commonwealth v. Callahan*, Ky., 675 S.W.2d 391, 392–3 (1984); *Gall v. Commonwealth, supra* note 21 at 110 ("[T]here have been no authoritative decisions since [*Whorton*] to suggest either that 'reasonable doubt' must be defined or that specific reference be made to the burden of proof." *Id.*); *Whorton v. Commonwealth*, Ky., 570 S.W.2d 627, 631 (1978).

**30.** *See Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583, 590 (1994):

> The beyond a reasonable doubt standard is a requirement of due process, *but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.* Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. *Id.* (Emphasis Added)

**31.** *See Commonwealth v. Hager*, Ky., 41 S.W.3d 828, 831 (2001). *See also Id.* at 847.

**32.** *Jacobs I, supra* note 1 at 418.

**33.** *Id.*

the respondent trial judge to permit counsel to present evidence of petitioner's mental illness, in order that petitioner exercise his right to present a defense to the charges, support jury instructions on lesser included offenses, or support a guilty but mentally ill finding, and present evidence in support of statutory and non-statutory mitigating factors which may convince a jury to not impose the penalty of death[.]"

 In an unpublished order, this Court granted a portion of the relief requested, but allowed defense counsel to introduce mental health evidence during the guilt/innocence phase only by avowal:

The trial court's refusal to allow evidence *by avowal* is an incorrect extension of *Jacobs, supra,* and against the clear weight of the law. For that reason, we grant the petition for a writ of prohibition as to the following issues. *The trial court is hereby directed to allow appellant to present, by avowal only, evidence of mental illness during the guilt phase of the trial . . . .* Furthermore, in the event there is a penalty phase, petitioner may present direct testimony concerning mitigating factors pursuant to KRS 532.025. Additionally, the trial court is directed to allow avowal testimony as to any mental illness issues not expressly included in the aforementioned statute.

Jacobs argues that the trial court's ruling erroneously interpreted our holdings and incorrectly allowed Jacobs to direct his trial counsel not to introduce any mental illness evidence during the guilt/innocence phase. Jacobs attempts to distinguish a defendant's right to waive an insanity defense from other questions of trial strategy and argues that his trial counsel should have been allowed to introduce evidence relating to Jacobs's mental health which was "not inconsistent with" Jacobs's decision to pursue a guilt/innocence phase defense on the merits. We find no error in the trial court's ruling. First, although our order in Jacobs's original action allowed the defense to introduce such testimony by avowal during the guilt/innocence phase, the defense made no attempt to do so. Further, we find disingenuous Appellant's characterization of this proposed evidence as "not inconsistent with" the chosen defense. Jacobs's trial counsel wanted to introduce testimony to prove that Jacobs's testimony regarding the events leading to his victim's death—while a sincere belief—was delusional. Although counsel sought to introduce this evidence for a purpose technically distinct from the pursuit of an insanity defense, allowing defense counsel to introduce evidence suggesting that Jacobs "didn't know what he was talking about" would certainly have "seriously compromise[d] [Jacobs's] chosen alternative defense, as well as threaten[ed] his ... reputational interests."[34] The fact that Jacobs's defense of denial and his trial counsel's proposed mental health defense could both be broadly construed as a "defense on the merits" does not harmonize the inconsistencies. We believe the trial court properly found that Jacobs could choose to defend against the merits without introducing evidence of his mental illness. The trial court found Jacobs competent to act as "master of his own defense and pilot of the ship." By seeking to introduce evidence of Jacobs's mental illness against their client's wishes, the well-intentioned defense counsel improperly attempted to replace their judgment for Jacobs's. The trial court's ruling properly placed Jacobs at the helm.

34. *Dean v. Commonwealth,* Ky., 777 S.W.2d 900, 908 (1989).

We see no merit in Jacobs's remaining allegations of guilt/innocence phase error. Specifically, we find: (1) the trial court acted well within its discretion when it denied Jacobs's trial counsel's motion to withdraw; (2) the instances of prosecutorial misconduct alleged fell within the bounds of permissible questioning and argument; (3) the trial judge's remote connection to Alice Lloyd College did not require his recusal; and (4) no combination of errors warrants reversal of Jacobs's convictions.

## III. IMPROPER AGGRAVATING CIRCUMSTANCE

■■■ At Jacobs's first trial, the only aggravating circumstance alleged by the Commonwealth, submitted in the trial court's instructions, and found by the jury was that "at the time he killed Judy Ann Howard, the defendant, Clawvern Jacobs, was engaging in the commission of rape in the first degree."[35] Upon remand, the Commonwealth gave notice that it would allege another aggravating circumstance— that Jacobs murdered Howard during the commission of a kidnapping.

After the jury's guilt/innocence phase verdict which found Jacobs guilty not of attempted first degree rape, but the lesser-included offense of first degree sexual abuse, the trial court's capital sentencing phase instructions allowed the jury to consider only one possible aggravating circumstance in determining the appropriate penalty for Jacobs's murder conviction:

## INSTRUCTION NO. 3 AGGRAVATING CIRCUMSTANCES

In fixing a sentence for the defendant for the offense of Murder, you shall consider the following aggravating circumstances which you may find from the evidence beyond a reasonable doubt to be true:

The defendant murdered Judy Ann Howard and that at the time Clawvern Jacobs murdered Judy Ann Howard he was engaged in the commission of kidnapping.

On its verdict form, the jury indicated that it found the aggravating circumstance beyond a reasonable doubt and copied verbatim the language of Instruction No. 3. Because we find that the General Assembly has not established kidnapping as an aggravating circumstance to the crime of murder, we reverse Jacobs's sentence of death and remand the matter to the trial court for sentencing on non-capital murder.

In *Gregg v. Georgia*,[36] the United States Supreme Court examined legislative amendments to Georgia's death penalty statutes four years after it had declared Georgia's death penalty procedures unconstitutional in *Furman v. Georgia*.[37] The *Gregg* court determined that the new death penalty procedures passed constitutional muster and emphasized that the statutes "channel" a jury's discretion to impose the death penalty by requiring it to find a statutory aggravating factor:

The basic concern of Furman centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. Left un-

---

**35.** *See Jacobs I, supra* note 1 at 420.

**36.** 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

**37.** 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

guided, juries imposed the death sentence in a way that could only be called freakish. The new Georgia sentencing procedures, by contrast, focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines.[38]

Kentucky's statutory death penalty sentencing procedures likewise control jury discretion by requiring juries to identify authorized aggravating circumstances before returning a sentence of death:

> The jury, if its verdict be a recommendation of death, or imprisonment for life without benefit of probation or parole, or imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In nonjury cases, the judge shall make such designation. In all cases unless at least one (1) of the statutory aggravating circumstances enumerated in subsection (2) of this section is so found, the death penalty, or imprisonment for life without possibility

of probation or parole, or the sentence to imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall not be imposed.[39]

The list of eight aggravating circumstances contained at KRS 532.025(2)(a) does not include the aggravating circumstance found in this case. The Commonwealth cites this Court's opinion in *Harris v. Commonwealth*[40] in support of its contention that the trial court's death penalty instructions were proper. In *Harris*, we held that juries must find beyond a reasonable doubt an aggravating circumstance "authorized by law" before imposing the death penalty, but that juries need not necessarily find one of the aggravating circumstances enumerated in KRS 532.025(2)(a).[41] The *Harris* Court identified a circumstance within the kidnapping statute itself which aggravates the crime of capital kidnapping and affirmed Harris's sentence of life without possibility of parole for twenty-five (25) years for capital kidnapping:

> Here, the "aggravating circumstance otherwise authorized by law" is provided by the penalty section of the kidnapping statute, KRS 509.040(2), which makes kidnapping a capital offense when the victim is not released alive.

Although observers have levied some criticism at the reasoning behind the *Harris* holding,[42] we need not address the viability of the *Harris* holding in this case because *Harris* holds only that a defendant is

---

**38.** *Gregg v. Georgia, supra* note 36 at 428 U.S. at 207, 96 S.Ct. at 2940, 49 L.Ed.2d at 893.

**39.** KRS 532.025(3).

**40.** Ky., 793 S.W.2d 802 (1990).

**41.** *Id.* at 805.

**42.** *See* Robert G. Lawson and William H. Fortune, *Kentucky Criminal Law* § 19–7(c)(2) & (3) at 695–6 (LEXIS 1998) (characterizing the *Harris* ruling as "clearly at odds with the language of the statute and seem[ing] clearly to put the statute at constitutional risk." *Id.* at 696).

death-eligible for the offense of capital kidnapping if he or she also murdered the kidnapping victim.[43] The case now before us involves a sentence of death not for a kidnapping conviction, but for a murder conviction—Jacobs was convicted of kidnapping, but received a sentence of life imprisonment. And *Harris* simply does not hold that a defendant convicted of murder is death-eligible if he or she also kidnapped the murder victim. No such aggravating circumstance is "authorized by law" for the crime of murder, and any attempt to engineer one from the *Harris* holding would require more legal gymnastics than the Constitution's demand for determinacy in death penalty cases could withstand.

Kentucky statutory designation of kidnapping as a capital offense is a minority position found in only a handful of other jurisdictions,[44] and the General Assembly's failure to address the intersection between Kentucky's two capital crimes in KRS 532.025 likely stems from its attempt to define aggravating circumstances applicable to both capital crimes. The Model Penal Code's draft provisions for aggravating circumstances in capital cases contemplate a statutory scheme which authorizes capital punishment only in murder cases,[45] and designate as an aggravating circumstance the fact that the murder was committed while the defendant was in the course of a number of violent felony offenses, including kidnapping.[46] Of the jurisdictions which authorize imposition of the death penalty for the crime of murder, most have specific statutory aggravating circumstances for murders committed in connection with a kidnapping crime.[47]

43. *See St. Clair v. Roark, supra* note 3 at 486–7 (2000) ("In *Harris* ... we held that the *murder* of the victim by the kidnapper was an aggravating circumstance 'otherwise authorized by law,' which would justify imposition of capital punishment *for the offense of capital kidnapping*." *Id.* (citation omitted and underlined emphasis added)); *Young v. Commonwealth,* Ky., 50 S.W.3d 148, 155 n. 1 (2001) ("While kidnapping is enhanced to a capital offense if the victim is not released alive or subsequently dies as a result of the kidnapping, the additional element of intent to kill in KRS 507.020(1)(a) provides the statutory aggravating circumstance authorizing capital punishment *for kidnapping.*" *Id.* (emphasis added)).

44. *See* Ga.Code Ann. § 16–5–40 (2000); Idaho Code § 18–4505 (2000); Mont.Code Ann. §§ 45–5–303 & 46–18–303 (2000); S.D. Codified Laws § 22–19–1 (2001).

45. *See* Model Penal Code & Commentaries, Part II, § 210.6, Comment 3 at 117 (A.L.I. 1980) ("Although the Model Code neither endorses nor rejects capital punishment for murder, it does disallow the death penalty for all other offenses." *Id.*).

46. *See Id.* at § 210.6(3)(e) at 109:
 (3) Aggravating Circumstances

. . .

(e) The murder was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, rape or deviate sexual intercourse by force or threat of force, arson, burglary or *kidnapping.*

*Id.* (emphasis added).

47. *See* Ala.Code § 13A–5–49(4) (2001) (tracking language of Model Penal Code); Cal Penal Code § 190.2(a)(17)(B) (2001) (tracking language of Model Penal Code); Colo.Rev. Stat. § 16–11–103(5)(d) (2000) ("The defendant intentionally killed a person kidnapped or being held as a hostage by the defendant or anyone associated with the defendant." *Id.*); Conn. Gen.Stat. § 53a–54b (2001) ("A person is guilty of a capital felony who is convicted of any of the following: ... (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety." *Id.*); Del.Code Ann. § 4209(e)(1)(j) (2000) (tracking language of Model Penal Code); Fla. Stat. ch. 921.141(5)(d) (2000) (tracking language of Model Penal Code); Ga.Code Ann § 17–10–30(b)(2) (2000) ("The offense of murder, rape, armed robbery or kidnapping was committed while the offender was engaged in

the commission of another capital felony." *Id.*); Idaho Code § 19–2515(h)(7) (2000) ("The murder was committed in the perpetration of, or attempt to perpetrate ... kidnapping ... and the defendant killed, intended a killing, or acted with reckless indifference to human life." *Id.*); Ill. Comp Stat 5/9–1(6) (2001):

> (6) the murdered individual was killed in the course of another felony if:
> (a) the murdered individual:
> (i) was actually killed by the defendant, or
> (ii) received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant is legally accountable under Section 5–2 of this Code, and the physical injuries inflicted by either the defendant or the other person or persons for whose conduct he is legally accountable caused the death of the murdered individual; and
> (b) in performing the acts which caused the death of the murdered individual or which resulted in physical injuries personally inflicted by the defendant on the murdered individual under the circumstances of subdivision (ii) of paragraph (6) of subsection (b) of this Section, the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another; and
> (c) the other felony was one of the following ... aggravated kidnapping ... or the attempt to commit any of the felonies listed in this subsection (c) ....

*Id.;* Ind.Code Ann. § 35–50–2–9(b)(1)(e) (2000) ("The defendant committed the murder by intentionally killing the victim while committing or attempting to commit any of the following: ... (E) Kidnapping ...." *Id.*); La.Code Crim. Proc. Ann. art 905.4(A)(1) (2000) ("The offender was engaged in the perpetration or attempted perpetration of ... aggravated kidnapping ...." *Id.*); Md.Code Ann. art. 27, § 413(d)(4) (2001) ("The victim was taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct." *Id.*); Miss. Code Ann. § 99–19–101(5)(d) (2001) (tracking language of Model Penal Code); Mo.Rev.Stat. § 565.032(2)(11) (2001) (tracking language of Model Penal Code); Nev.Rev.Stat. Ann. § 200.033(4) (2001):

> The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit, any ... kidnapping in the first degree, and the person charged:
> (a) Killed or attempted to kill the person murdered; or
> (b) Knew or had reason to know that life would be taken or lethal force used.

*Id.;* N.J. Stat. Ann. § 2C:11–3(c)(4) (2001) (tracking language of Model Penal Code); N.M. Stat. Ann. § 31–20A–5(B) (2000) ("[T]he murder was committed with intent to kill in the commission of or attempt to commit kidnaping ...." *Id.*); N.Y. Penal Law § 125.27(1)(a)(vii) (2001):

> [T]he victim was killed while the defendant was in the course of committing or attempting to commit and in furtherance of ... kidnapping in the first degree ... or in the course of an furtherance of immediate flight after committing or attempting to commit any such crime ... provided however, the victim is not a participant in one of the aforementioned crimes and, provided further that, unless the defendant's criminal liability under this subparagraph is based upon the defendant having commanded another person to cause the death of the victim or intended victim pursuant to section 20.00 of this chapter, this subparagraph shall not apply where the victim's criminal liability is based upon the conduct of another pursuant to section 20.00 of this chapter ....

*Id.;* N.C. Gen.Stat. § 15A–2000(e)(5) (2000) (tracking language of Model Penal Code); Ohio Rev.Code Ann. § 2929.04(A)(7) (Anderson 2001) (tracking language of Model Penal Code); S.C.Code Ann. § 16–3–20(c)(a)(1)(b) (2000) ("The murder was committed while in the commission of the following crimes or acts: ... (b) kidnapping." *Id.*); Tenn.Code Ann. § 39–13–204(i)(7) (2001) (tracking language of Model Penal Code); Tex. Penal Code § 19.03(a)(2) (2000) ("[T]he person intentionally commits the murder in the course of committing or attempting to commit kidnapping ...." *Id.*); Utah Code Ann. § 76–5–202(1)(d) (2000) (tracking language of Model Penal Code, but specifying offenses of "aggravated kidnaping, kidnaping, or child kidnaping." *Id.*); Wash. Rev.Code. Ann. § 10.95.020(11)(d) (2001) ("The murder was committed in the course of, in furtherance of, or in immediate flight from one of the following crimes: ... (d) Kidnapping in

KRS 532.025 contains an aggravating circumstance for capital crimes committed in the course of certain designated felonies,[48] but that circumstance does not address the possibility of concurrent capital crimes.

The Kentucky legislature has simply not identified "while in the course of a kidnapping" as an aggravating circumstance which authorizes capital punishment for a murder conviction. This Court has no business saying otherwise. As we recently stated in *Young v. Commonwealth*,[49] "[t]he death penalty cannot be imposed simply because we or the jury believe the actions or motives of a particular defendant are deserving of capital punishment. That is the kind of discretionary, ad hoc application of the death penalty specifically condemned in *Furman*."[50]

Accordingly, we reverse Jacobs's sentence of death for murder and remand his murder conviction to the trial court for resentencing within the penalty range authorized by law for his murder conviction.[51] Although we do not separately address Jacobs's allegation that the trial court erred when it prevented Jacobs from introducing certain evidence during the sentencing phase, we note that, upon remand, the trial court should determine the admissibility of evidence in accordance with KRS 532.055(2) and the Kentucky Rules of Evidence.

## IV. CONCLUSION

We affirm Jacobs's conviction for murder and the convictions and sentences imposed for capital kidnapping and first degree sexual abuse. We reverse Jacobs's sentence of death and remand this matter to the trial court for further proceedings consistent with this opinion.

LAMBERT, C.J.; COOPER, JOHNSTONE and KELLER, JJ., concur.

GRAVES, J., concurs in part and dissents in part by separate opinion in which WINTERSHEIMER, J., joins.

LAMBERT, C.J., concurs by separate opinion.

STUMBO, J., not sitting.

## OPINION CONCURRING IN PART AND DISSENTING IN PART BY JUSTICE GRAVES

Although I concur with most of the majority's opinion, common sense and reason compel me to dissent in regard to Part III because the logic of words should yield to the logic of realities.

Murder and kidnaping are the only two capital crimes in the Penal Code. I disagree with the majority that kidnaping is not available as an aggravating circumstance authorizing capital punishment for a conviction of murder. Kidnaping is enhanced to a capital offense by the victim's death. Even though the victim's death

---

the first degree ...." *Id.*); Wyo. Stat. Ann. § 6–2–102(h)(xii) (2001) ("The defendant killed another human being purposely and with premeditated malice and while engaged in, or as an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any ... kidnapping ...." *Id.*).

**48.** *See* KRS 532.025(2)(a)(2) ("The offense of murder or kidnapping was committed while the offender was engaged in the commission of arson in the first degree, robbery in the

first degree, burglary in the first degree, rape in the first degree, or sodomy in the first degree." *Id.*).

**49.** *Supra* note 43 at 161.

**50.** *Id.* ("Absent a statutory aggravating circumstance specifically applicable to the defendant or the defendant's own conduct, he/she cannot be subjected to the death penalty." *Id.*)

**51.** KRS 532.030(1).

need not have been intended, the additional element of intent to kill in the murder statute, KRS 507.020 is an aggravating factor that should authorize capital punishment. That is, the universal should include the particular. One can determine what is right in specific cases even without a universal theory of what is right.

I believe that under KRS 532.025(2)(a) and *Harris v. Commonwealth*, Ky., 793 S.W.2d 802 (1990), the trial court was correct in allowing Kidnaping to be a proper aggravating circumstance for a jury to consider in a capital murder case.

We held in *Harris*, that the aggravating circumstances that a jury can consider in a capital case are not limited to the seven enumerated in KRS 532.025(2)(a), but rather the introductory language of KRS 532.025(2)(a) allows for a judge and jury to consider "any aggravating circumstance otherwise authorized by law." *Id* at 805. Kentucky law holds that kidnaping is a capital offense that warrants consideration of the death penalty if the victim is not released alive. KRS 509.040(2). Therefore, since the General Assembly has established kidnaping to be a capital offense, then certainly it must also be an aggravating factor that warrants consideration of the death penalty for the capital offense of murder. It takes no legal gymnastics, linguistic chicanery or judicial activism to reach this conclusion. In fact, considering the context in which the statute was written, the *Harris* interpretation gives proper meaning to the words in the statute.

In *Harris v. Commonwealth, supra,* we further held that a defendant is eligible for consideration of a death penalty sentence for kidnaping if the defendant murders his kidnaped victim. Therefore, it defies reason and logic that if a person is found guilty of the capital offense of kidnaping and he murders his victim, then murder is an aggravating factor that can warrant

consideration of the death penalty, but if a person is found guilty of murder and has kidnaped his victim, then kidnaping is not an aggravating factor that can warrant consideration of the death penalty. That is, if A equals B, and if B equals C, it should be obvious that A must equal C.

Legislatures are, by definition, designed to reflect the political majority's will. This is not one of those rare settings where only one literal reading of the statute is possible. The majority opinion does not accord with legislative intent. We are elected judges interpreting laws enacted by elected legislators. Interpretations should be consistent with legitimate majoritarian expectations. Since both murder and kidnaping are the only capital offenses in the Penal Code it is a reasonable interpretation of legislative intent that one should be an aggravator of the other. Until this date *Harris* was still the law in Kentucky and served as an important precedent for judges in sentencing. *Harris* was correct in interpreting the introductory language of Kentucky Revised Statutes section 532.025(2) to allow a judge or jury to find an aggravating circumstance outside of those listed in section 532.025(2)(a).

In order to avoid making the same mistake twice, the Kentucky General Assembly should clarify this language to make the statute consistent with the legislative intent and the will of the majority. Since the statute is now being read with strict literalism, the General Assembly should be more precise in drafting statutes. When the General Assembly revises the Kentucky Penal Code, it is important to consider the inconsistencies in the interpretation of section 532.025. The legislature should also consider current principles set forth by the United States Supreme Court and draft a new section which is clear on its face in its interpretation and application to avoid a future constitutional challenge

that the law is "arbitrary," "capricious," or vague.

WINTERSHEIMER, J., joins this concurring and dissenting opinion.

LAMBERT, Chief Justice, Concurring.

KRS 532.025(3) states in part as follows: In all cases unless at least one (1) of the statutory aggravating circumstances enumerated in subsection (2) of this section is so found, the death penalty, or imprisonment for life without benefit of probation or parole, or the sentence to imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall not be imposed.

In KRS 532.025(2)(a)(1–7), the statutory aggravating circumstances referred to hereinabove are set forth. A careful examination of the seven aggravating circumstances fails to reveal the crime of kidnapping as an aggravating factor when the underlying crime is murder. While the crime of kidnapping may be prosecuted as a capital offense, it may not serve as an aggravator to the crime of murder.

In its verdict rendered during the penalty phase of appellant's trial, the jury made the following finding:

The defendant murdered Judy Ann Howard and that at the time Clawvern Jacobs murdered Judy Ann Howard he was engaged in the commission of kidnapping.

Thus the only aggravating circumstance found by the jury was kidnapping and kidnapping is not an available circumstance.

It is a wonder that the Legislature omitted from the statutory scheme the act of kidnapping as an aggravating circumstance to the crime of murder. The only conceivable explanation for such an omission is oversight, but it is not the prerogative of this Court to create aggravating circumstances when the statute expressly forbids it.

For these reasons, I concur with the majority opinion.